*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
September 10, 2019

*In re* WATTS, Minors.

No. 346832
Livingston Circuit Court
Family Division
LC No. 2016-015410-NA

Before: MURRAY, C.J., and METER and FORT HOOD, JJ.

PER CURIAM.

Respondent mother appeals as of right the termination of her parental rights to two children, LW and EW, under MCL 712A.19b(3)(c)(*i*) (failure to rectify conditions that led to adjudication), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm).[1] Because the trial court did not clearly err by finding a statutory basis for termination of parental rights, that petitioner, the Department of Health and Human Services (DHHS), made reasonable efforts at reunification, and that termination of respondent's parental rights was in the children's best interests, we affirm.

## I. BACKGROUND

Petitioner removed the children from respondent's custody in late December 2016 after police officers apprehended respondent in her car after a high-speed car chase with crack cocaine and four-year-old EW in the backseat, scared and crying. Police officers smashed the driver's side window when respondent refused to open the window. EW told the police that he had not had anything to eat or drink that day. Police officers found drugs and drug paraphernalia in the vehicle, and they arrested respondent. Respondent was charged with second-degree child abuse, MCL 750.136b(3), fleeing and eluding police, MCL 257.602a(3), and three counts of resisting or obstructing a police officer, MCL 750.81d(1). Respondent was released on bond, but she did

---

[1] The children's father, who was initially named in the petition, died during these proceedings. In addition, respondent's oldest child, who was also removed from respondent's home, turned 18 during the proceedings. Hence, only respondent's parental rights to LW and EW are at issue.

not appear at the probable cause hearing, so a bench warrant was issued. Respondent later testified that she had gone to Detroit to use crack cocaine during this period of time. Police officers later found respondent, who gave the officers a fake name, which led to another charge for an ordinance violation. Respondent pleaded guilty and was sentenced to 3 to 10 years in prison. The petition to remove the children from respondent's custody also described respondent's years-long history of crack cocaine use.

The children were placed with respondent's mother after their removal from respondent's custody. Respondent continued to receive services while in jail, and after her transfer to a correctional facility after sentencing. When respondent's mother reported in the spring of 2018 that she would not be able to care for the children long-term, petitioner investigated other relative placements proposed by respondent, but no other relatives were willing to care for the children long-term. The trial court authorized the filing of a termination petition, and held a hearing on the termination petition. The trial court found statutory grounds for termination under MCL 712A.19b(3)(c)(*i*), (g), and (j), and it found that termination of respondent's parental rights was in the children's best interests.

## II. DISCUSSION

### A. STATUTORY BASIS FOR TERMINATION

Respondent first challenges the statutory grounds for termination. We discern no clear error in the trial court's findings of statutory grounds for termination.

"This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

"Parents have a significant interest in the companionship, care, custody, and management of their children, and the interest is an element of liberty protected by due process." *In re JK*, 468 Mich 202, 210; 661 NW2d 216 (2003). That right is limited by the state's "legitimate interest in protecting the moral, emotional, mental, and physical welfare of the minor and in some circumstances neglectful parents may be separated from their children." *In re Sanders*, 495 Mich 394, 409-410; 852 NW2d 524 (2014) (quotation marks and citation omitted). To that end, the trial court must first find that statutory grounds for termination of a respondent's parental rights exist, and petitioner bears the burden of proving a statutory basis for termination. *In re Trejo Minors*, 462 Mich 341, 350, 352-354; 612 NW2d 407 (2000), superseded by statute on other grounds as stated in *In re Moss*, 301 Mich App 76, 83; 836 NW2d 182 (2013). The trial court need only find one statutory ground for termination. *In re Foster*, 285 Mich App 630, 633; 776 NW2d 415 (2009). Once the trial court has found a statutory ground for termination, the trial court must determine whether termination of the respondent's parental rights is in the children's best interests, evaluating the record evidence as a whole. *In re Trejo Minors*, 462 Mich at 354.

In this case, the trial court cited MCL 712A.19b(3)(c)(*i*), (g), and (j) as statutory grounds for termination.

The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, [one] or more of the following:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . :

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[2]

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent. [MCL 712A.19b(3)(c)(*i*), (g), (j).]

1. MCL 712A.19b(3)(c)(*i*)

The initial dispositional order was issued on April 6, 2017. Petitioner filed a termination petition on June 12, 2018. Accordingly, more than 182 days had passed since issuance of the initial dispositional order.

The initial petition identified respondent's substance abuse and criminal history, culminating in the most recent charges for which she was incarcerated, as the basis for the adjudication. A respondent's belated participation in substance abuse treatment, combined with evidence showing that the respondent would require 18 to 24 months of treatment and additional

---

[2] MCL 712A.19b(3)(g) was amended on June 12, 2018. 2018 PA 58. Respondent's brief cites the preamendment version of Section 19b(3)(g), but the trial court correctly cited the current version, taking into consideration the parent's financial ability.

time to address related issues, supported a finding that termination was warranted under MCL 712A.19b(3)(c)(*i*). *In re Fried*, 266 Mich App 535, 541-542; 702 NW2d 192 (2005).[3]

The record evidence supported the trial court's findings and conclusions under this subsection. There was ample evidence that respondent did not understand or appreciate the harm she caused the children through her substance abuse, nor did she fully understand or appreciate the seriousness of her substance abuse and inability to remain substance free while out of prison. The evidence showed that although respondent had completed various substance abuse programs in prison, including attending meetings and a class, and formulating a relapse prevention plan, she did not acknowledge the severity of the effects of her substance use. When she described her 10-year history of substance use, respondent provided inconsistent testimony about how often she used crack cocaine before the December 2016 incident, stating that she went on "drug binges," that she did not go on drug binges as "consistently" as she stated in the presentence investigation report (PSIR), and that she was sober before the December 2016 relapse except for the use of prescribed medication. When confronted with the statement in the PSIR that she had been prescribed several hundred pills obtained from four different prescribing physicians, respondent justified the prescriptions as properly prescribed by doctors in the same practice, and stated that she took the pills as prescribed, before admitting that she may have become addicted to hydrocodone. She stated that she would not resume use of these pills because she had learned to manage her pain with over-the-counter medication.

Respondent further denied or rationalized her family members' statements, including statements made by an older child about respondent's keeping drug paraphernalia around the house, how she behaved when using substances, and accusing the children of stealing her medications. She admitted to disappearing for days at a time on "drug binges," but denied taking LW with her on one such binge and returning with him soaked in urine. Respondent's continued excuses for her history of substance abuse do not show that she will be able to remain sober in the future when she refuses to acknowledge the severity of her past substance abuse and its effect on the children.

In addition, although respondent's relapse prevention plan contains a blueprint for future plans, including reuniting with the children, it contains no details about how respondent will work toward reunification. Respondent believed that the only consequences the children suffered from her substance abuse were that she sometimes did not come home when she should have, and was sometimes not around to parent the children. On the other hand, the therapist testified that the children experienced symptoms of trauma, a characterization respondent objected to by stating that she did not believe the therapist used the word "traumatized." Although it is understandable that respondent might attempt to minimize the severity of her substance abuse problem and its impact on her children in hopes of reunifying with her children, respondent's description of the December 2016 events, and her minimization of the effects of her

---

[3] The Michigan Supreme Court has expressed disapproval of this rule, but declined to overturn it. *In re Hicks/Brown*, 500 Mich 79, 88-89; 893 NW2d 637 (2017).

substance abuse on her children, call into question whether respondent fully appreciates the severity of the harmful impact of her substance abuse on the children.

Respondent's testimony about the future also showed an impaired understanding of her situation. She did not believe that staying sober in prison was easier than staying sober in the community, a belief that is not consistent with her admission that she used crack cocaine in the brief period of time between her release on December 23, 2016, and her arrest on January 11, 2017, the only period of time during this case when she was living in the community.

Further, the caseworker stated that once respondent was released, he wanted to see respondent maintain sobriety for 12 months because relapse tended to occur eight or nine months after release. The children had been in care for over 18 months by the time of the termination hearing in August 2018. However well-intended respondent's plan to remain substance free after her release, her substance abuse history and her continued minimization of that history and its effect on the children demonstrated that the conditions that led to the adjudication persisted, and there was no reasonable expectation that they would be rectified within a reasonable amount of time given the children's ages.

## 2. MCL 712A.19b(3)(g)

Respondent argues that she had a plan for housing and employment and that she completed services in prison, demonstrating that she would be able to provide the children with proper care and custody. Minimal compliance with the goals of the case service plan does not necessarily demonstrate that a parent will be able to provide the children with proper care and custody within a reasonable time under MCL 712A.19b(3)(g). See *In re BZ*, 264 Mich App at 300-301. When the respondent will require "a lengthy period" of continued supervision, even after demonstrating improvement in a substance abuse treatment program, the trial court does not clearly err by finding that there is no reasonable expectation of providing the children with proper care or custody within a reasonable amount of time. *In re Williams*, 286 Mich App 253, 272-273; 779 NW2d 286 (2009).

Respondent testified regarding her plans for obtaining a job and housing by getting a job in the food industry or as a part-time receptionist, and by moving into her grandmother's house. But the trial court properly found this testimony suspect. Respondent did not have definite employment, and she did not have the opportunity to demonstrate that she could maintain steady employment. She provided no objective evidence to substantiate her testimony that she could live at her grandmother's house, which had been bequeathed to her father.[4] Further, this testimony was not consistent with her relapse prevention plan, which listed two treatment centers as her first two options for housing. Even if respondent would be able to get a job and obtain suitable housing soon after her release, respondent's views of her substance abuse remained concerning. As previously discussed, respondent repeatedly minimized the impact of her substance abuse on the children. In addition, her belief that she would remain substance free was

---

[4] Respondent asserted that her grandmother had not yet drawn up a deed with respondent's name on it because her grandmother intended to do so after respondent's release.

inconsistent with her admitted substance abuse during the brief period of time during this case when she was not incarcerated.

In addition, respondent would have to maintain sobriety for one year after her release, and the children had already been in care for over 18 months when the termination hearing began in August 2018. Moreover, respondent would have to reestablish a parenting relationship with the children, and evidence showed that the telephone conversations between respondent and the children were upsetting to the children because they were confused about why she was not around. The therapist testified that she had not been successful in helping EW regulate his emotions, and that LW persisted in not talking about how he felt about respondent. Respondent's refusal to acknowledge that the children demonstrated trauma-related symptoms calls into question whether she will be able to provide the children with the support they need. The speculative nature of these conditions (housing, employment, and caring for the children) supports the trial court's finding that respondent was not likely to be able to provide the children with proper care or custody within a reasonable time given their ages.[5]

Accordingly, respondent has not identified clear error in the trial court's finding that there was no reasonable expectation that respondent would be able to provide the children with proper care or custody within a reasonable amount of time.

### 3. MCL 712A.19b(3)(j)

Respondent argues that she had arranged for housing and employment after her release, and that she had completed numerous services in prison that showed that the children would not likely be harmed if returned to her care after her release. Exhibiting poor judgment, combined with a "lengthy history of instability," supports termination under MCL 712A.19b(3)(j). *In re Utrera*, 281 Mich App 1, 25-26; 761 NW2d 253 (2008). Respondent had completed substance abuse programming in prison, formulated a relapse prevention plan, and studied Spanish, law, plumbing, psychology, and electrical skills. However, her 10-year history of substance abuse, continuing through the brief period of time in this case when she was not incarcerated, combined with her previously discussed inability to acknowledge the severity of that history or its impact on her children, demonstrate that her substance abuse history gave rise to continued cause for concern. Respondent stated her belief that the children would be more upset if they were separated from her, but she refused to admit that they experienced trauma as a result of her behavior. Although respondent admitted that she had made poor decisions, she did not demonstrate that she understood the impact of those decisions on the children. Her plans for

---

[5] A caseworker testified that respondent's completion of services in prison did not demonstrate compliance with the case plan because she had not demonstrated that she would obtain housing and a job, and remain sober in the community. The caseworker's concern about respondent's ability to transfer those learned skills to the community did not overlook respondent's completion of services in prison, but recognized the limitation of the benefits respondent could receive from those services. Further, in light of respondent's minimization of her past substance abuse and its effect on her children, the caseworker's concern about the limited benefit was substantiated.

after her release did not adequately account for how her poor judgment in the past had affected the children, and the trial court did not clearly err by concluding that there was a reasonable likelihood of harm to the children if they were returned to respondent's care.

### 4. REASONABLE EFFORTS AT REUNIFICATION

Respondent argues that petitioner failed to make reasonable efforts to reunify the family because no caseworker had seen respondent since November 2017, or reviewed the treatment plan with respondent since then because the agency failed to refer respondent for a psychological evaluation or other services, because the agency required respondent to complete drug screens even though she could not do so in prison, and because the agency expected respondent to participate in the children's therapy when the therapist refused to allow it.

DHHS must generally make "[r]easonable efforts to reunify the child and family . . . ." MCL 712A.19a(2). This obligation applies to an incarcerated parent. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). In *In re Mason*, 486 Mich at 155-157, DHHS did not give the respondent the opportunity to participate in the hearings by telephone, did not give the respondent copies of the case service plan, and did not offer the respondent any services.

As a preliminary matter, respondent did not raise this issue in a timely manner. To preserve this issue, the respondent must object when the trial court adopts the case service plan. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012).[6] Respondent did not raise this issue until closing argument at the termination hearing. An unpreserved issue is reviewed for "plain error affecting substantial rights." *In re HRC*, 286 Mich App 444, 450; 781 NW2d 105 (2009). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App at 9.

Unlike in *In re Mason*, respondent appeared at every hearing starting in March 2017, when she pleaded to the allegations, except for the hearing on the lawyer-guardian ad litem's motion regarding parenting time. The caseworker testified that *visiting* respondent in prison proved difficult, but that he last spoke with respondent over the telephone in July 2018. The caseworker had not been able to review the treatment plan with respondent after her transfer to prison, but he had mailed a copy of it to respondent in prison. More significantly, respondent demonstrated a familiarity with the case service plan by confirming at the termination hearing that she knew the case service plan required her to obtain an income and housing, remain substance free, and by testifying that she demonstrated appropriate parenting skills. Respondent further testified that she met those goals, and these four components were the basis of the trial court's findings regarding the statutory grounds for termination.

Regarding the psychological evaluation, the caseworker testified that respondent was not referred for a psychological evaluation after respondent was transferred to prison, even though the case service plan required her to undergo a psychological evaluation, and she was not

---

[6] The Michigan Supreme Court has expressed disapproval of this rule, but declined to overturn it. *In re Hicks/Brown*, 500 Mich at 88-89.

referred for individual counseling because she was incarcerated. However, the trial court did not consider the fact that respondent did not undergo a psychological evaluation or participate in counseling as a finding in favor of termination.

Regarding the drug screens required by the case service plan, the caseworker testified that the case service plan had to include drug screens because of respondent's substance abuse, even though the agency did not make a referral for drug screens because respondent was incarcerated, but the caseworker's testimony shows that he did not expect respondent to complete drug screens when she could not do so in prison. Additionally, the trial court did not cite the failure to complete drug screens as a finding in favor of termination. Rather, the trial court acknowledged that respondent could not complete drug screens while incarcerated before noting that respondent used drugs during the brief period of time between her release at the end of December 2016, and her arrest in early January 2017, as respondent admitted.

Regarding whether respondent should have been permitted to participate in the children's therapy by telephone, respondent is correct in that the therapist did not believe respondent's participation in the children's therapy would be beneficial when respondent asked about the possibility. Although the caseworker stated that respondent had not participated in the children's therapy, the trial court did not consider respondent's participation or nonparticipation in therapy as a finding in support of a statutory basis for termination.

In short, the trial court only took into consideration the services respondent could complete and had completed while incarcerated, and found most concerning respondent's minimization of her substance abuse problem. Respondent's parental rights were not terminated without her participation in this case or without her understanding of the expectations for her actions and behavior. Therefore, the trial court did not clearly err by finding that DHHS made reasonable efforts at reunification.

## 5. MANUFACTURED CIRCUMSTANCES

Respondent argues that petitioner engineered the circumstances that led to the termination of respondent's parental rights for the same reasons that it failed to put forth a reasonable effort toward reunification, as well as by refusing to permit the children to visit respondent in prison, and by moving the children from the relative placement with their grandmother to a nonrelative, preadoptive placement. In *In re B & J*, 279 Mich App 12, 15, 18-19; 756 NW2d 234 (2008), the petitioner was precluded from seeking termination of parental rights when it intentionally created the basis for termination by bringing about the respondents' deportation when it contacted immigration enforcement authorities. Unlike that decision, here petitioner did not create the circumstances that led it to seek termination of respondent's parental rights.

Petitioner was not responsible for not allowing the children to visit respondent in prison. The trial court has discretion to place conditions on parenting time that serve the best interests of the children. *In re Laster*, 303 Mich App 485, 490; 845 NW2d 540 (2013). At the beginning of the case, the trial court suspended respondent's parenting time because of respondent's outstanding warrant in the criminal case and her drug use. According to respondent's testimony, she was in Detroit using drugs when she missed the second hearing in this case, which was when

her parenting time was suspended. At the plea hearing in this case in March 2017, the first hearing respondent attended, and at the review hearing in April 2017, the trial court ordered parenting time at the discretion of the children's therapist. At the May 2017 hearing and the June 2017 hearing, testimony showed that the children's therapist refused to make a recommendation regarding parenting time, but the caseworker had been facilitating communication by letter, and the trial court allowed respondent to call the children on the telephone until a therapist could meet with the children and make a recommendation about parenting time. By the time of the September 2017 hearing, respondent was talking with the children on the telephone, and the trial court allowed the telephone calls to continue, but did not allow visits at the prison. In fact, the telephone calls continued through the termination hearing. Thus, the trial court expanded parenting time beyond the therapist's recommendations. Petitioner and the agency did not attempt to curtail parenting time visits, and it was the trial court that ruled against in-person visits on the basis of the therapist's recommendation. Accordingly, petitioner was not responsible for preventing respondent from having parenting time with the children in person at the prison.

Petitioner was also not responsible for the decision of respondent's mother that she could no longer care for the children. The children were placed with respondent's mother when respondent was arrested in December 2016. More than one year later, in March 2018, petitioner reported that respondent's mother stated that she would not be able to care for the children through respondent's earliest release date in February 2020, but respondent's mother agreed to keep the children in her care through the end of the school year. Respondent gave petitioner the names of her two sisters who might act as caregivers, and petitioner requested an additional 60 days to investigate the possibility of another relative placement before the trial court made a permanency planning decision. The trial court continued the proceeding for that investigation. At the following hearing in May 2018, the agency reported that it had not found an appropriate relative placement, and that the relatives proposed by respondent were not interested in adoption or guardianship.

Instead, the caseworker had located a foster family willing to take both children, and continue their relationship with their grandmother. Thus, the children were placed with a nonrelative foster family only after petitioner attempted to find another relative placement. Respondent's unsubstantiated belief that her mother would care for the children through the completion of these proceedings does not defeat the events that unfolded over two hearings before petitioner sought authorization to file a termination petition. The record shows that the children were placed with a nonrelative foster family as a result of respondent's failure to identify relatives who were willing to care for the children long-term, and respondent's mother's decision that she could no longer care for them. This placement was not the result of a set of circumstances manufactured by petitioner to facilitate termination of respondent's parental rights.

Respondent's actions led to her incarceration and her consequent separation from the children, placing the strain of caring for them on respondent's mother. Respondent's argument that petitioner created the circumstances that led to the termination of her parental rights is consistent with her inability to fully appreciate the consequences of her choices that prompted the initiation of this entire child protective proceeding.

B. BEST INTERESTS

Respondent argues that the trial court clearly erred by determining that termination of her parental rights was in the children's best interests.

This Court reviews for clear error a trial court's best-interest determination. *In re White*, 303 Mich App at 713. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App at 296-297.

Once the trial court has found a statutory basis for termination, "the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). The best-interest analysis focuses on the children, not the parent. *In re Moss*, 301 Mich App at 88. The trial court "may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App at 41-42 (citations omitted). Other factors include "the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714.

Respondent argues that termination was not in the children's best interests because they had already lost their sister, father, and maternal grandmother, rendering even more traumatic the loss of their mother, and that because respondent had demonstrated improvement through engaging in services, waiting another year and a half to reunify with her was in the children's best interests.

Respondent's arguments overlook the need for permanency and stability, which the caseworker and the therapist testified were necessary for the children to make progress in processing the effects of the trauma they had experienced. The children were ages four and six when they entered care in December 2016, and they had been in care for 18 months by the time the termination hearing started in August 2018. Even if respondent is released in February 2020, the caseworker testified that he wanted to see respondent remain sober for another year because, in his experience, relapse after release from incarceration tended to happen eight to nine months after release, pushing potential reunification to February 2021. By this time, the children would be ages eight and ten, and would have spent a significant portion of their young lives outside of respondent's custody. The therapist testified that the children needed a stable environment to support their therapy to address the trauma they had experienced, and that their trauma-based symptoms would continue without that safety and stability. Another two and a half years of potential instability would hinder their improvement.

Additionally, the children were in a preadoptive placement and had shown improvement, dovetailing with the therapist's testimony that they needed a stable environment to make progress. The children's need for permanency and stability outweighed other concerns, and their demonstrated improvement with the preadoptive family supported the trial court's finding that the children should not be forced to wait indefinitely for permanency and stability. Therefore, the trial court did not clearly err by finding that termination of respondent's parental rights was in the children's best interests.

Affirmed.

/s/ Christopher M. Murray
/s/ Patrick M. Meter
/s/ Karen M. Fort Hood